IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


PETTIT V. BOLTE


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


WILLIAM B. PETTIT, APPELLEE,

V.

KYLE A. BOLTE, APPELLANT.


Filed February 18, 2025.    No. A-24-437.


Appeal from the District Court for Douglas County: STEPHANIE R. HANSEN, Judge. Affirmed.

Natalie M. Andrews, of Chandler | Conway, P.C., L.L.O., for appellant.

No brief for appellee.


RIEDMANN, Chief Judge, and PIRTLE and ARTERBURN, Judges.

ARTERBURN, Judge.

## INTRODUCTION

Kyle A. Bolte appeals the Douglas County District Court's entry of a harassment protection order against him and in favor of William B. Pettit. Bolte asserts that the district court erred in finding that the evidence was sufficient to prove that he engaged in a "harassing course of conduct" toward Pettit. Upon our review of the record, we affirm the district court's entry of the harassment protection order in favor of Pettit.

## BACKGROUND

Bolte's mother was engaged to Pettit at the time of her death in January 2024. Prior to that time, Pettit had lived with Bolte's mother in a home owned by her. She left the home to Pettit in her will and, as such, he continued to reside there after her death.

- 1 -

On April 30, 2024, Pettit filed a petition and affidavit to obtain a harassment protection order against Bolte. In his affidavit, Pettit asserted that on April 13, Bolte entered his home and assaulted him:

> In my residence, [Bolte] charged at me full speed and pushed me backward where I fell against a rolling kitchen cart. I then fell on the floor, and [Bolte] stood over me and proceeded to drive his fist down onto my head multiple times. He also kicked me in the buttocks and rib cage and struck my forearms and right elbow. My glasses were crushed into a ball. I put up no resistance knowing I was overpowered, waiting for him to stop. Once he stopped I called 911 and was taken to the [emergency room] where I had several scans which showed a broken rib, severe trauma to my head, and numerous painful contusions. To this day, 4/29/2024, I have trouble opening my mouth due to pain at my left temple.

The district court did not issue an ex parte harassment protection order based upon the allegation contained in Pettit's petition and affidavit, but issued an order to show cause. The order to show cause indicated that a hearing had been scheduled for May 16, 2024, so that Bolte could appear and show cause why a harassment protection order should not be issued. At the May 16 hearing, both Pettit and Bolte appeared without counsel and testified. The court received into evidence Pettit's petition and affidavit.

Pettit testified that he is 73 years old and suffering from stage 4 prostate cancer. He described Bolte as being 53 years old and much bigger and stronger than he is. Pettit indicated that after Bolte's mother's death, Bolte was upset that his mother left her house to Pettit. Bolte continued to refer to the house as "my mother's house" in Pettit's presence and had entered the house on other occasions without first knocking or announcing his presence. Pettit described an incident on the day Bolte's mother was buried where Bolte entered the house with multiple other individuals and took "whatever they wanted."

As for the incident which occurred on April 13, 2024, Pettit stated that he argued with Bolte when he entered the home. However, he denied exhibiting any sort of physical aggression toward Bolte prior to Bolte assaulting him. Pettit testified that after the April 13 assault, he lives in fear. He has added an additional lock on his back patio door to try and keep Bolte out of the house. He checks the locks on all of the doors multiple times per day, and even wakes up in the middle of the night to check the locks. He is afraid to answer his door. Pettit testified that he is additionally fearful because he knows that Bolte possesses an assault rifle.

On May 6, 2024, after Pettit had filed his petition and affidavit, he received what he believed to be a "threatening" text message from Bolte. He asked the district court to enter the protection order so that he would not have to have any further contact with Bolte.

During his testimony, Bolte described the events of April 13, 2024, differently than Pettit. Bolte testified that he went to the house with someone named "Mary" to retrieve his mother's possessions and to obtain paperwork for the probate court proceedings involving his mother. When Mary began discussing with Pettit the filing of certain tax documents for Bolte's mother, Bolte observed Pettit to "bec[o]me aggressive and start[] yelling and cursing" at Mary. Bolte positioned himself between Pettit and Mary to protect Mary, and attempted to calm Pettit down. Pettit then became physically aggressive and put his hands on Bolte's chest. Bolte pushed Pettit away from

him. Initially, Pettit lost his balance, but then he righted himself, began flailing his arms, and attempted to strike Bolte. Bolte described that he backed up and pushed Pettit from the living room into the kitchen where Pettit fell against a cart and then onto the floor. Even as he was lying on the ground, Pettit tried to kick Bolte, so Bolte struck him three times to defend himself. Bolte hit Pettit two times on the side of his head and one time on his face. When Pettit stopped fighting back, Bolte walked away. Pettit called 911 on his own and ultimately left the house in an ambulance.

Bolte admitted to sending Pettit a text message on May 6, 2024, but indicated that the message merely informed Pettit to not contact Bolte's daughter in any way. Bolte testified that this was the only contact he has had with Pettit since the April 13 incident. He also testified that he has no intention of ever again speaking to or interacting with Pettit.

At the close of the hearing, the district court made an oral finding that Pettit had met his burden of proof and that a harassment protection order would be entered against Bolte. The court noted that its finding was based upon evidence that "there was an altercation that did cause injury to [Pettit], causing him fear." Later that day, the district court entered a harassment protection order, which was to be in effect for one year. Bolte has timely appealed to this court.

## ASSIGNMENT OF ERROR

Bolte, now represented by counsel, assigns that the district court erred by finding that the evidence presented was sufficient to support the conclusion that Bolte engaged in a harassing course of conduct.

## STANDARD OF REVIEW

The grant or denial of a protection order is reviewed de novo on the record. *Diedra T. v. Justina R.*, 313 Neb. 417, 984 N.W.2d 312 (2023). In such de novo review, an appellate court reaches conclusions independent of the factual findings of the trial court. *Id*. However, where the credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the circumstances that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Id*.

## ANALYSIS

A show cause hearing in protection order proceedings is a contested factual hearing, in which the issues before the court are whether the facts stated in the sworn application are true. *Mahmood v. Mahmud*, 279 Neb. 390, 778 N.W.2d 426 (2010). A protection order is analogous to an injunction. *Hawkins v. Delgado*, 308 Neb. 301, 953 N.W.2d 765 (2021). A party seeking an injunction must establish by a preponderance of the evidence every controverted fact necessary to entitle the claimant to relief. *Id*.

Pursuant to Neb. Rev. Stat. § 28-311.09 (Cum. Supp. 2022), "[a]ny victim who has been harassed as defined by section 28-311.02 may file a petition and affidavit for a harassment protection order . . . ." Neb. Rev. Stat. § 28-311.02(2)(a) (Reissue 2016), in turn, defines the term "harass" to mean "to engage in a knowing and willful course of conduct directed at a specific person which seriously terrifies, threatens, or intimidates the person and which serves no legitimate purpose." "Course of conduct" is defined as "a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose, including a series of acts

of following, detaining, restraining the personal liberty of, or stalking the person or telephoning, contacting, or otherwise communicating with the person." § 28-311.02(2)(b).

In analyzing § 28-311.02, the Nebraska Supreme Court has concluded that Nebraska's stalking and harassment statutes are given an objective construction and that the victim's experience resulting from the perpetrator's conduct should be assessed on an objective basis. See *In re Interest of Jeffrey K.*, 273 Neb. 239, 728 N.W.2d 606 (2007). Thus, the inquiry is whether a reasonable person would be seriously terrified, threatened, or intimidated by the perpetrator's conduct. See *id*.

Upon our de novo review, we find sufficient evidence to support the district court's entry of a harassment protection order against Bolte and in favor of Pettit. Given the district court's entry of the protection order, it clearly found Pettit's version of the events occurring between he and Bolte to be more credible than Bolte's version. With the district court's implicit credibility finding in mind, we read the evidence presented at the show cause hearing to demonstrate that after Bolte's mother's death in January 2024, Bolte repeatedly entered the house left to Pettit in her will without Pettit's permission. Pettit testified at the show cause hearing that Bolte refused to recognize that the house now belonged to Pettit. Pettit explained that Bolte would simply walk into the house uninvited, which Pettit found "very disturbing." On the day Bolte's mother was buried, he entered the house without permission, bringing additional people with him. Together, they removed "whatever they wanted" without giving Pettit a chance to object.

Bolte's pattern of entering Pettit's house without permission culminated in the events of April 13, 2024, when Bolte again appeared at Pettit's house with the expressed intention of removing items which he believed belonged to his mother. While Bolte was inside the house, he physically assaulted Pettit. This assault left Pettit with multiple physical injuries, but also resulted in him living in constant fear of Bolte's return. Pettit testified that he added new locks to at least one door in his home and checked to make sure all of the locks were engaged multiple times every day and night.

Taken together, we conclude that the evidence presented at the show cause hearing sufficiently demonstrates that Bolte engaged in a knowing and willful course of conduct directed at Pettit which seriously terrified, threatened, or intimidated Pettit, and which served no legitimate purpose. Bolte repeatedly entered Pettit's house without permission and with seemingly nefarious intentions. Even if we accepted his contention that he was entitled to the possession of some of the items located in the home, he was not entitled to enter unannounced and remove items through the use of physical violence and intimidation. His actions threatened, and intimidated Pettit, and ultimately resulted in physical injury. We further conclude that given Bolte's pattern of behavior, in particular, his violent assault of Pettit on April 13, 2024, Pettit's fear of Bolte was objectively reasonable.

In his brief on appeal, Bolte argues that there was no evidence that he engaged in a "course of conduct" as defined by § 28-311.02(2)(b) because "the conduct between the parties . . . is limited to one altercation." Brief for appellant at 13. As we detailed above, we disagree with Bolte's interpretation of the evidence. Pettit's testimony at the show cause hearing demonstrated that Bolte had exhibited a pattern of coming into Pettit's house without permission. On one such occasion, Bolte and his acquaintances took items from the home without Pettit's consent. And, on another such occasion, Bolte physically assaulted Pettit. Such evidence demonstrates a pattern comprised

over a period of time evidencing a continuity of purpose, namely, to intimidate Pettit. Given this evidence, we find that Bolte engaged in a "course of conduct" as defined by § 28-311.02(2)(b). Bolte's suggestion to the contrary is without merit.

## CONCLUSION

Having conducted a de novo review of the evidence presented at the show cause hearing, we find that there was sufficient evidence presented to support the entry of a harassment protection order against Bolte and in favor of Pettit. We therefore affirm the judgment of the district court.

AFFIRMED.